# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; and CHARLES A. WHOBREY, as Trustee,<br><br>           Plaintiffs,<br><br>    v.<br><br>CHARLES M. ARMSTRONG, an individual; CHARLES M. ARMSTRONG LIVING TRUST; and CHARLES M. ARMSTRONG and BRIAN DANIELL, in their capacity as trustees for the Charles M. Armstrong Living Trust,<br><br>           Defendants. | Case No. 22-6994<br><br>Judge<br><br>Magistrate Judge |

## COMPLAINT

Plaintiffs, Central States, Southeast and Southwest Areas Pension Fund, and Charles A. Whobrey, Trustee, for a cause of action allege as follows:

## JURISDICTION AND VENUE

1. This is an action for collection of withdrawal liability, interest, and penalties incurred by an employer as a result of a withdrawal from a multiemployer pension plan and arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §1001 *et seq.,* and under Illinois' Uniform Fraudulent Transfer Act ("UFTA"), 740 ILCS §160/1 *et seq*.

2. This Court has jurisdiction over this action under 29 U.S.C. §§1132(e), 1132(f), and 1451(c), and 28 U.S.C. §§1331 and 1367.

3. Venue lies in this Court under 29 U.S.C. §§1132(e)(2) and 1451(d), in that the Central States, Southeast and Southwest Areas Pension Fund (the "Pension Fund") is administered at its principal place of business in Chicago, Illinois.

## PARTIES

4. The Pension Fund is a multiemployer pension plan within the meaning of 29 U.S.C. §§1002(37) and 1301(a)(3).

5. The Pension Fund is a non-profit, multiemployer pension plan and trust which is operated in accordance with a trust agreement. The Pension Fund is primarily funded by contributions remitted by multiple participating employers pursuant to collective bargaining agreements negotiated with local unions affiliated with the International Brotherhood of Teamsters (the "IBT") on behalf of employees of those same employers. All principal and income from such contributions and investments thereof is held and used for the exclusive purpose of providing pension benefits to participants and beneficiaries of the Pension Fund and paying the administrative expenses of the Pension Fund.

6. Plaintiff Charles A. Whobrey is a present trustee and fiduciary of the Pension Fund within the meaning 29 U.S.C. §1002(21)(A), and he and his fellow trustees are the plan sponsor of the Pension Fund within the meaning 29 U.S.C. §1301(a)(10). The Trustees administer the Pension Fund at 8647 West Higgins Road, Chicago, Illinois.

7. Pursuant to 29 U.S.C. §§1132(a)(3) and 1451(a)(1), the Trustees, by and through their designated trustee, Charles A. Whobrey, are authorized to bring this action on behalf of the Pension Fund, its participants, and its beneficiaries for the purpose of collecting withdrawal liability.

8. Defendant Charles M. Armstrong ("Armstrong") is an individual who previously resided in the State of Illinois and currently resides in the State of Florida.

9. Upon information and belief, Defendant Charles M. Armstrong Living Trust is an Illinois revocable living trust dated September 17, 2013 (the "Armstrong Trust").

10. Upon information and belief, Armstrong is the grantor and grantee of the Armstrong Trust.

11. Non-Defendant Brian Daniell is an individual who resides in the State of Illinois.

12. Upon information and belief, Defendant Charles M. Armstrong and Brian Daniell are Trustees of the Armstrong Trust.

13. Non-party A.J. Walker Construction Company ("A.J. Walker") is or was a corporation organized under the laws of the State of Delaware, with its principal and sole place of business located in Mattoon, Illinois, until it ceased operations in December 2018.

14. Non-party Myron Boyd is a deceased individual who resided in the State of Illinois until his death in 2018, and he is the father of Geoffrey Boyd.

15. Non-party Geoffrey Boyd is an individual who resides in the State of Illinois, and he is the son of Myron Boyd.

## INTRODUCTION

16. At the heart of this case is Armstrong's manipulation of his control of A.J. Walker to avoid A.J. Walker's obligation to pay withdrawal liability owed to the Pension Fund.

17. The MPPAA provides that when an employer withdraws from a multiemployer plan, it must pay "withdrawal liability" in an amount roughly equal to its proportionate share of the plan's unfunded vested benefits. 29 U.S.C. §§ 1381, 1391.

18. Employers become obligated to pay withdrawal liability only when they "withdraw" from the pension plan—that is, when they permanently cease making contributions to the plan on behalf of their employees, or reduce their obligations in such a way as to trigger a "partial" withdrawal. 29 U.S.C. §§ 1383, 1385.

19. A.J. Walker was a participating employer in the Pension Fund that incurred partial withdrawal liability and then complete withdrawal liability under MPPAA to the Pension Fund.

20. Rather than pay the withdrawal liability owed to the Pension Fund, Armstrong caused A.J. Walker to transfer over $1,000,000 to himself via the Armstrong Trust, leaving A.J. Walker insolvent and unable to pay the amounts owed to the Pension Fund.

21. MPPAA further provides that any transaction with a principal purpose of evading or avoiding withdrawal liability shall be disregarded for purposes of assessing and collecting withdrawal liability. 29 U.S.C. § 1392(c).

22. The Illinois UFTA, in part, provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time,

and the insider had reasonable cause to believe that the debtor was insolvent.

740 Ill. Comp. Stat. Ann. § 160/6.

23. As discussed in paragraphs 34-40 below, in 2012, A.J. Walker incurred partial withdrawal liability to the Pension Fund in the principal amount of $770,723.07 (the "Partial Withdrawal Liability").

24. As discussed in paragraphs 41-44 below, in December 2018, A.J. Walker ceased operations and incurred complete withdrawal liability to the Pension Fund in the principal amount of $1,057,817.27 (the "Complete Withdrawal Liability").

25. As discussed in paragraphs 45-47 below, on November 19, 2019, the Pension Fund obtained a judgment against A.J. Walker for the Partial Withdrawal Liability and Complete Withdrawal Liability in the total amount of $2,089,959.09, plus post-judgment interest (the "2019 Judgment"). To date, the full amount of the 2019 Judgment remains due and owing to the Pension Fund.

26. As discussed in paragraphs 48-51 below, from at least 2005 until December 2012, Armstrong owned 100% of A.J. Walker and was the president and individual responsible for the company's day-to-day operations. From December 2012 through December 2018, Armstrong was an officer and director of A.J. Walker, and active in the company's operations.

27. As discussed in paragraphs 51-58 below, shortly before A.J. Walker ceased operations in December 2018, Armstrong caused A.J. Walker to distribute certain of its assets in the amount of $1,016,260.33 to him, or to the Armstrong Trust for his benefit (the "Armstrong Distribution").

28. Upon information and belief, after A.J. Walker ceased operations in December 2018, it paid all of its other creditors (except for the Pension Fund).

29. After the Armstrong Distribution and payments to other creditors, A.J. Walker did not have any remaining assets to pay the withdrawal liability owed to the Pension Fund.

30. In short, rather than pay A.J. Walker's withdrawal liability or the related 2019 Judgment owed to the Pension Fund, Armstrong engaged in a scheme whereby he transferred $1,016,260.33 to himself (or to the Armstrong Trust for his benefit) in violation of the MPPAA's evade and avoid provision, 29 U.S.C. § 1392(c), and Illinois' UFTA, 740 Ill. Comp. Stat. Ann. § 160/1, *et seq.*

31. As alleged in Count I, a principal purpose of the Armstrong Distribution was to evade or avoid the withdrawal liability owed by A.J. Walker to the Pension Fund, and thus, violated ERISA, 29 U.S.C. § 1392(c).

32. As alleged in Count II, the Armstrong Distribution was fraudulent as to the Pension Fund and, thus, violated the Illinois UFTA, 740 Ill. Comp. Stat. Ann. § 160/1, *et seq.*

## BACKGROUND INFORMATION

**I.    A.J. Walker's withdrawal liability and the 2019 Judgment against A.J. Walker.**

33. During all relevant times, A.J. Walker was bound by collective bargaining agreements with local unions affiliated with the IBT, under which A.J. Walker was required to make contributions to the Pension Fund on behalf of certain of its employees.

**A. A.J. Walker's Partial Withdrawal Liability in the principal amount of $770,723.07.**

34. As a result of a decline in A.J. Walker's contributions to the Pension Fund, on December 31, 2012, A.J. Walker effected a "partial withdrawal" from the Pension Fund as defined in 29 U.S.C. §1385(a)(1) (the "2012 Partial Withdrawal").

35. As a result of the 2012 Partial Withdrawal, A.J. Walker incurred withdrawal liability to the Pension Fund in the principal amount of $770,723.07, as determined under 29 U.S.C. §1381(b) (previously defined as the "Partial Withdrawal Liability").

36. On or about May 21, 2014, A.J. Walker received a notice and demand for payment of the Partial Withdrawal Liability issued by the Pension Fund in accordance with 29 U.S.C. §§ 1382(2) and 1399(b)(1), which notified A.J. Walker that it was required to discharge the Partial Withdrawal Liability in a lump sum payment of $770,723.07 or in monthly payments of $5,578.59, with the first installment payment due on or before June 1, 2014, and the final installment payment due on or before May 1, 2034.

37. On November 18, 2016, A.J. Walker initiated arbitration with the American Arbitration Association to contest the Partial Withdrawal Liability, which was entitled *A.J. Walker Construction Company and Central States, Southeast and Southwest Areas Pension Fund*, Case No. 01-16-0005-0650 (the "Arbitration").

38. On August 10, 2018, an award was issued in the Arbitration in favor of the Pension Fund and against A.J. Walker, which confirmed the full amount of the Partial Withdrawal Liability in the amount of $770,723.07, and required A.J. Walker to continue to make the monthly payments due on account of the Partial Withdrawal Liability in accordance with the payment schedule set by the Pension Fund (the "Arbitration Award").

39. On November 6, 2018, a default judgment was entered in favor of the Pension Fund and against A.J. Walker in the U.S. District Court for the Northern District of Illinois in a case entitled *Central States, Southeast and Southwest Areas Pension Fund, et al. v. A.J. Walker Construction Company*, Case No. 18 C 5665 (the "2018 Judgment"). The 2018 Judgment affirmed the Arbitration Award and reaffirmed the Partial Withdrawal Liability in the principal amount of $770,723.07, and required A.J. Walker to continue to make the monthly payments due on account of the Partial Withdrawal Liability in accordance with the payment schedule set by the Pension Fund.

40. From June 2014 through May 2019, A.J. Walker made 60 monthly withdrawal liability payments in the total amount of $334,715.40 on account of the Partial Withdrawal Liability. Thereafter, no payments were made by A.J. Walker prior to the entry of the 2019 Judgment.

**B.   A.J. Walker's Complete Withdrawal Liability in the principal amount of $1,057,817.27.**

41. After A.J. Walker ceased operations on or about December 2, 2018, A.J. Walker permanently ceased to have an obligation to contribute to the Pension Fund and/or permanently ceased all covered operations, thereby effecting a "complete withdrawal" from the Pension Fund within the meaning of 29 U.S.C. § 1383 (the "2018 Complete Withdrawal").

42. As a result of the 2018 Complete Withdrawal, A.J. Walker incurred withdrawal liability to the Pension Fund in the principal amount of $1,057,817.27, as determined under 29 U.S.C. § 1381(b) (previously referred to as the "Complete Withdrawal Liability").

43. On or about June 28, 2019, A.J. Walker received a notice and demand for payment of the Complete Withdrawal Liability issued by the Pension Fund in accordance with 29 U.S.C. §§ 1382(2) and 1399(b)(1), which demanded full payment of the entire amount of the Complete Withdrawal Liability by July 8, 2019, pursuant to 29 U.S.C. § 1399(c)(5)(B), and Appendix E, § 5(e)(2)(E) of the Pension Fund Plan since the Pension Fund believed there was a substantial likelihood that A.J. Walker would be unable to pay the Complete Withdrawal Liability due to the sale of A.J. Walker's assets.

44. A.J. Walker failed to make the Complete Withdrawal Liability payment to the Pension Fund.

45. On July 31, 2019, the Pension Fund filed suit against A.J. Walker in the U.S. District Court for the Northern District of Illinois in a case entitled *Central States, Southeast and Southwest Areas Pension Fund, et al. v. A.J. Walker Construction Company*, Case No. 19-cv-5163 (the "2019 Lawsuit").

46. On November 19, 2019, a default judgment was entered in the 2019 Lawsuit for the Partial Withdrawal Liability and the Complete Withdrawal Liability in favor of the Pension Fund and against A.J. Walker in the total amount of $2,089,959.09, plus post-judgment interest (previously identified as the "2019 Judgment").

47. To date, the full amount of the 2019 Judgment remains due and owing to the Pension Fund.

**II.  Armstrong's ownership and control of A.J. Walker.**

48. During the period from approximately 2005 until on or about December 28, 2012, Armstrong owned 100% of the total combined voting power of all classes of

outstanding stock entitled to vote or 100% of the total value of outstanding shares of all classes of stock of A.J. Walker.

49. During the period from approximately 2005 until on or about December 28, 2012, Armstrong was the president and individual responsible for day-to-day operations of A.J. Walker.

50. On or about December 28, 2012, Armstrong sold A.J. Walker to Geoffrey Boyd and Myron Boyd (the "A.J. Walker Sale").

51. After the A.J. Walker Sale, from December 28, 2012 through at least December 2018, Armstrong continued to be an officer and director of A.J. Walker, and remained active in its operations until the company ceased operations in December 2018.

### III. The Armstrong Distribution.

52. Upon information and belief, from at least January 2013 to August 28, 2018, A.J. Walker had an account with Ameriprise Financial Services, Inc. ("Ameriprise") identified as account number 64138565 (the "A.J. Walker Ameriprise Account").

53. Upon information and belief, on or about August 28, 2018, the A.J. Walker Ameriprise Account held assets valued in the total amount of $1,016,260.33.

54. Upon information and belief, on August 28, 2018, the Armstrong Trust had an account with Ameriprise identified as account number 71836140 (the "Armstrong Trust Ameriprise Account").

55. On or about August 28, 2018, A.J. Walker transferred the assets in the A.J. Walker Ameriprise Account to the Armstrong Trust Ameriprise Account in the total amount of $1,016,260.33 (previously identified as the "Armstrong Distribution").

56. The Armstrong Distribution in the amount of $1,016,260.33 occurred after A.J. Walker was assessed the Partial Withdrawal Liability and after the Arbitration Award was entered on August 10, 2018, in favor of the Pension Fund.

57. In addition, the Armstrong Distribution occurred shortly before A.J. Walker ceased operations and was assessed the Complete Withdrawal Liability in December 2018.

58. Upon information and belief, neither Armstrong nor the Armstrong Trust provided any consideration to A.J. Walker in exchange for the Armstrong Distribution.

59. At the time, or as a result of the Armstrong Distribution, A.J. Walker was left insolvent and lacked sufficient assets to pay its creditors, including the Partial Withdrawal Liability and the Complete Withdrawal Liability owed to the Pension Fund.

## COUNT I -
## UNDER MPPAA'S EVADE OR AVOID PROVISION

60. Plaintiffs reallege and incorporate by reference paragraphs 1-59 as and for paragraph 60 of Count I of this Complaint.

61. 29 U.S.C. § 1392(c) prohibits a transaction if a principal purpose of such transaction is to evade or avoid the payment of withdrawal liability to the Pension Fund.

62. As discussed in paragraphs 52-59 above, the Armstrong Distribution occurred after A.J. Walker incurred the Partial Withdrawal Liability and almost immediately after the Arbitration Award was entered in favor of the Pension Fund in August 2018.

63. As discussed in paragraphs 52-55, and 57 above, the Armstrong Distribution occurred shortly before A.J. Walker ceased operations and incurred the Complete Withdrawal Liability in December 2018.

64. Upon information and belief, neither Armstrong nor the Armstrong Trust provided any consideration to A.J. Walker in exchange for the Armstrong Distribution.

65. At the time, or as a result of the Armstrong Distribution, A.J. Walker was left insolvent and lacked sufficient assets to pay its creditors as demonstrated by A.J. Walker's failure to pay the Partial Withdrawal Liability, the Complete Withdrawal Liability, the 2018 Judgment, and/or 2019 Judgment.

66. Upon information and belief, a principal purpose behind the Armstrong Distribution was to evade or avoid the payment of the Partial Withdrawal Liability and Complete Withdrawal Liability owed by A.J. Walker to the Pension Fund.

67. Under 29 U.S.C. § 1392(c), the Armstrong Distribution may be disregarded, and Armstrong and/or the Armstrong Trust may be held liable to the Pension Fund for all amounts transferred to them from A.J. Walker.

**WHEREFORE**, Plaintiffs request the following relief:

(a) That the Court void and disregard the Armstrong Distribution;

(b) That the Court enter a judgment against Armstrong or the Armstrong Trust for the amount due on account of the 2019 Judgment or the amounts improperly transferred to Armstrong or the Armstrong Trust whichever is less, pre-judgment interest as allowed by law, plus such other and future amounts to be proven in this case;

(c) Attorney's fees and costs; and

(d) For such further or different relief as this Court may deem proper and just.

## COUNT II - UNDER ILLINOIS' UNIFORM FRAUDULENT TRANSFER ACT

68. Plaintiffs reallege and incorporate by reference paragraphs 1-59 as and for paragraph 68 of Count II of this Complaint.

69. This count is brought by the Pension Fund as a creditor of A.J. Walker under Illinois' UFTA, 740 ILCS §160/1 *et seq.*, for the collection of improper distributions by A.J. Walker to Armstrong or the Armstrong Trust.

70. As discussed in paragraphs 34-40 above, on August 10, 2018, the Pension Fund obtained the Arbitration Award against A.J. Walker for the Partial Withdrawal Liability.

71. As discussed in paragraphs 52-59 above, the Armstrong Distribution occurred after A.J. Walker incurred the Partial Withdrawal Liability and almost immediately after the Arbitration Award was entered in favor of the Pension Fund in August 2018.

72. As discussed in paragraphs 52-55, 57 above, the Armstrong Distribution occurred shortly before A.J. Walker ceased operations and incurred the Complete Withdrawal Liability in December 2018.

73. Rather than pay the Partial Withdrawal Liability, the Arbitration Award, the 2018 Judgment, and later the 2019 Judgment owed to the Pension Fund, Armstrong caused A.J. Walker to transfer the assets held in the A.J. Walker Ameriprise Account to himself or to the Armstrong Trust leaving A.J. Walker insolvent and with insufficient assets to pay the Partial Withdrawal Liability and/or the Complete Withdrawal Liability.

74. The Armstrong Distribution was made and entered into with the intent to hinder, delay, or defraud A.J. Walker's creditors, including the Pension Fund.

75. Alternatively, the Armstrong Distribution was made without A.J. Walker receiving reasonably equivalent value and A.J. Walker believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

76. At the time of, or as a result of, the Armstrong Distribution, A.J. Walker was left insolvent and lacked sufficient assets to pay its creditors, such as the Pension Fund.

77. The Armstrong Distribution was fraudulent as to the Pension Fund who was a creditor of A.J. Walker before and after the Armstrong Distribution was made.

**WHEREFORE**, Plaintiffs request the following relief pursuant to Illinois' UFTA, 740 ILCS §160/8:

(a) Avoidance of the Armstrong Distribution to the extent necessary to satisfy the Pension Fund's claims;

(b) An attachment or other provisional remedy against the assets transferred;

(c) An injunction against the further disposition of the assets transferred;

(d) Appointment of a receiver to take charge of the assets transferred;

(e) For such further or different relief as this Court may deem proper and just, including but not limited to a money judgment.

Respectfully submitted,

/s/Anthony E. Napoli
Attorney for Plaintiffs
Central States Pension Fund
8647 W. Higgins Road, 8th Floor
Chicago, Illinois 60631
(847)-939-2469
ARDC # 06210910
tnapoli@centralstates.org

December 13, 2022